THE NATIONAL SHOE & LEATHER BANK'S APPEAL
FROM COMMISSIONERS.

New Haven Co., June T., 1887.  PARK, C. J., CARPENTER, PARDEE,
LOOMIS and BEARDSLEY, Js.

A corporation was organized for the manufacture of copper and brass
goods.  Held not to be *ultra vires* for it to borrow money to invest in
the raw material in excess of its necessities at the time, for the purpose
of taking advantage of low prices in the market.

*A B* was the financial agent in the city of New York of the corporation,
which was located in this state, with authority to procure accommoda-
tion loans on its credit.  A bank there discounted notes made by him
in his individual name and indorsed by "*A B, agent*," and the pro-
ceeds went to pay the obligations of the corporation.  Held, in a suit
of the bank against the corporation, that it was of no importance that
the bank did not know at the time that *A B* was agent of the corpora-
tion, and that it was enough if it was afterwards discovered and proved
on the trial.

The corporation claiming not to be liable for certain loans obtained at the
bank by *A B* as agent, it was held that evidence was admissible to
show the history of his transactions at the bank for several years pre-
ceding the obtaining of the loans, both to explain the manner in which
he did business and kept his account there, and to show a knowledge
of his doings on the part of the directors of the corporation.

The account to which the discounts were carried at the bank was kept in
the name of "*A B, agent*," and the corporation, to explain why it was
so kept, offered evidence that *A B* had become insolvent and could not
hold property in his own name.  Held properly excluded, as the ques-
tion was whether the bank loaned the money to the corporation or to
*A B*, and that it was immaterial whether he was a bankrupt.

And held that, so far as the evidence might have furnished a motive for
his keeping the account in that way, it was of no relevancy without
evidence offered, or promised to be offered, to show that the fact oper-
ated as such a motive or influenced his conduct in other like transac-
tions.  The mere fact of his insolvency, standing alone, could have no
effect.

[Argued June 8th—decided October 19th, 1887.]

APPEAL from the disallowance of a claim by the commissioners on the assigned estate of Brown & Brothers, an insolvent corporation; taken to the Superior Court in New Haven County, and heard before *Stoddard, J.* The court made the following finding of facts.

Prior to the year 1853 the partnership of Brown Bros., composed of several brothers named respectively Philo, William, James, and Augustus Brown, was carrying on in the town of Waterbury the business of manufacturing copper and brass goods. In that year the partnership was transformed into a joint stock corporation under the name of "Brown & Brothers," and the business continued to be prosecuted by the corporation until its failure in 1885. The amount of business done by it from 1875 to 1884 was from $500,000 to $1,000,000 annually, with a capital stock of $200,000.

In 1866 or 1867 a store and branch office was opened and thereafter continued in New York city. James Brown was first in charge of it for a few months and thereafter William H. Brown, a son of Philo Brown, until 1884. When Wm. H. Brown took charge Philo Brown was president of the corporation, James Brown secretary, and Augustus Brown treasurer. Philo' Brown was president from the organization of the corporation until his death in May, 1880, and the other officers continued in their respective offices until changes occurred as follows:—In 1873 James Brown was secretary and Wm. H. Brown was treasurer. In 1874 Philo Brown was president and treasurer, and Wm. H. Brown was secretary. In 1875 Philo Brown was president and treasurer, Wm. H. Brown was secretary, and Hiram Van Dusen was agent. The last named officers were continued until 1880, when Philo Brown died and Wm. H. Brown became president, Edward L. Frisbie secretary and assistant treasurer, and H. Van Dusen treasurer and agent. The same officers were chosen in 1881 and 1882, and in January, 1883, Wm. H. Brown was elected president and treasurer, H. Van Dusen secretary, and George H. Clowes assistant treasurer. And since 1875 no person except Van Dusen has a record

appointment as agent, unless in some special transaction. These officers resided in Waterbury, except Wm. H. Brown, who resided in New York city, and Van Dusen who was sometimes in Waterbury and sometimes in New York city. Wm. H. Brown was never president, secretary or treasurer before 1873. After 1875 Philo Brown and William H. Brown owned from half to two thirds of the stock, and always controlled the corporation.

Wm. H. Brown, from the time he took charge of the New York store and office, had exclusive charge of it and absolute control and management of the finances in connection with that branch of the business. He made sales of goods sent from Waterbury to the store, made collections for the corporation, purchased the raw material for the works at Waterbury, had general charge of the bank account at New York, and negotiated paper and loans for the corporation, and generally attended to any business in New York that required attention. No other person bought supplies or negotiated loans for the corporation in New York, and generally, whenever loans were required, they were obtained by Wm. H. Brown in New York.

Van Dusen was agent at Waterbury for the corporation, but had no special powers or duties in reference to the business in New York.

Against the objection of the appellees, Wm. H. Brown testified that about the year 1872, with the knowledge of the officers of the corporation, and with the acquiescence and in the presence of Philo Brown, he opened accounts with the Loan & Indemnity Company, a banking corporation in New York city, as follows:—One account with "Wm. H. Brown, Agent," and the other with "Brown & Bros., Wm. H. Brown, secretary;" and the signatures of Philo and William H. were then left at the bank. The records of the corporation do not show Wm. H. Brown's appointment as secretary until January, 1874. I find the facts as above testified to by him, except as to the date of beginning the account.

It was confusing to have the same bank account for the

business transactions at both Waterbury and New York, and the two accounts were opened as a matter of convenience in transacting the business of the corporation; the account of "Wm. H. Brown, Agent," being the one used for the New York business, and that of "Brown & Bros." for the business at Waterbury. Wm. H. Brown had exclusive control over the account of "Wm. H. Brown, Agent."

The Loan & Indemnity Co. went out of business in 1875, when the accounts were transferred to the National Shoe & Leather Bank, where they were opened in the same forms. Philo Brown and Wm. H. Brown left their signatures at the bank, and the signature of Van Dusen was sent or left there. Philo Brown had full knowledge of this transfer of the accounts, and they were so kept with his consent thereafter, and continued to be so kept until May, 1884, when the resignation of Wm. H. Brown was accepted.

The financial affairs of the New York branch ran into hundreds of thousands annually, and it became necessary in the prosecution of the business and the purchase of material to obtain loans in New York upon accommodation paper. These loans were obtained solely by Wm. H. Brown, and usually upon notes signed by him in the name of Brown & Bros., and secured by deposit of warehouse storage receipts of copper. They aggregated sixty or seventy in number, and in amount some $300,000 or $400,000. The accommodation notes were indorsed "Wm. H. Brown, Agent." Such loans and the proceeds of such notes were credited to the account of "Wm. H. Brown, Agent," and used in the business of the corporation and in payment of its obligations.

There is no record of the appointment of Wm. H. Brown as agent of the corporation; but for a period of more than nine years he acted as the New York agent and representative of the corporation, and during such time had exclusive charge of all loans and discounts obtained in New York.

The original of the $15,000 note in question was dated June 26th, 1880, signed "Brown & Bros., by Wm. H. Brown, Sec'y," and indorsed by Wm. H. Brown, Agent; it

was discounted by the Shoe & Leather Bank, and the proceeds credited to the "Agent" account. This note was renewed from time to time, and the note in question is the last of the series.

When the note was renewed the first time Wm. H. Brown desired (and so represented to the bank) to change the collateral, so that the copper represented by the warehouse receipts, held as collateral therefor, might be used at Waterbury by the corporation, and offered to substitute for it six hundred shares of the stock of the Norwalk Lock Co., then owned by Wm. H. Brown personally. His proposition was accepted by the bank, and because the new collateral was in his name the bank desired the form of the note changed so that the maker would appear to be the owner of the collateral. Thereupon the note was so drawn and was signed by Wm. H. Brown and indorsed by him as agent. The note was afterwards secured by other collateral belonging to Wm. H. Brown, including certain shares of the stock of Brown & Bros. The original note and each renewal thereof when renewed was by the bank marked "Paid." A check was drawn by Wm. H. Brown for the amount due on the note so paid, which check was charged in the "Agent" account.

The last of the series of the $15,000 notes was protested July 30th, 1884.

The original $2,400 note was made in December, 1880, signed by Wm. H. Brown, secured by the Norfolk Lock Co.'s stock belonging to him individually, indorsed by Wm. H. Brown, Agent, discounted by the appellant, and the proceeds placed to the "Agent" account; and it has been renewed from time to time, the proceeds of such renewals going to the credit of the same account, and finally resulting in the note in question. The loan was had and the note was made, indorsed, and discounted, exclusively for the use of Brown & Bros., and the corporation received the exclusive benefit of it. The note was signed by Wm. H. Brown personally, because the collateral was in his name.

The original $12,500 note was made November 12th,

1883, signed by Wm. H. Brown, and indorsed " Wm. H. Brown, Agent," and secured by five hundred shares of stock of Brown & Bros., belonging to Wm. H. Brown personally. The note was discounted by the appellant, and the proceeds of the discount placed to the credit of the " Agent " account, and has been renewed from time to time, the proceeds of such renewals going to the credit of the " Agent " account, and finally resulting in the note in question. The loan was had and note made, indorsed and discounted exclusively for the use of Brown & Bros., and the corporation received the exclusive benefit of it. It was signed by Wm. H. Brown personally, because the collateral was in his name.

The loans in question of $15,000, $2,400, and $12,500, were needed by the corporation in the prosecution of its business, and when made were understood by both Wm. H. Brown and the bank to be made to the corporation of Brown & Bros., and were obtained in the same way by Wm. H. Brown as he obtained others, except that, the collateral being held by him, he was required to be the maker of the notes ; and the proceeds of these loans and notes were used for the benefit of the corporation.

In all other instances the notes, being signed " Brown & Bros. by Wm. H. Brown, Sec'y," or " Pres.," have been recognized by the corporation as valid obligations.

In changing the form of the $15,000 note and in taking the notes for the loans of $2,400 and $12,500 respectively in the form in which they were taken, neither Wm. H. Brown nor the bank intended to affect the liability of the corporation in any manner.

The appellant on May 5th, 1884, was carrying loans on notes signed " Brown & Bros., by Wm. H. Brown, Pres.," to the amount of $17,000. These notes have either been paid by the corporation or allowed by the commissioners against its estate.

For many years before the failure of the corporation Wm. H. Brown had been in the habit, in connection with the business of buying supplies for immediate use at Waterbury, of obtaining loans in the name of and for the benefit of the

corporation, for quantities of copper, spelter, and other supplies, in excess of its immediate necessities, and for the purpose of obtaining the benefit of any rise in the price that might occur, and carrying such supplies by means of such loans. This course of business on the part of Wm. H. Brown was well known to his father, Philo Brown, but was not known to all the other officers, though at all times and by all the directors and officers of the corporation it was known that Wm. H. Brown was acting as the general and exclusive financial agent of the corporation in New York, that he negotiated loans, made collections, and generally that he conducted his business as he did, except that the officers, other than Philo Brown, were ignorant as to the detail and precise methods used by him in obtaining loans, drawing notes, making purchases and keeping accounts.

Wm. H. Brown made monthly returns to the home office of the merchandise sales at the New York store, and of all collections in regular course of the merchandise sales account. He also purported to make from time to time statements of all notes and other obligations of the corporation made by him in obtaining loans, making purchases of supplies, etc. But these returns do not include the loans and notes in question, and many other loans and notes hereafter referred to. No statement of the "Agent" account was ever sent to Waterbury or called for. No account was kept with him as agent at Waterbury. The inventories and annual returns made up and sworn to by Wm. H. Brown did not include the indebtedness in question, nor did they include all other outstanding notes and obligations signed "Brown & Bros., by William H. Brown, Sec'y," or "Pres."

As to actual knowledge on the part of the officers of the corporation of the existence of the loans and line of discount in question, I find that Van Dusen knew of the existence of some one or more of the notes, but did not regard them as obligations of the corporation, and that neither Frisbie nor Clowes had any knowledge of their existence; but all the officers knew that Wm. H. Brown was accustomed to make

loans upon the credit of the corporation, and sign notes therefor " Brown & Bros., by Wm. H. Brown, Sec'y," or " Pres." As to knowledge on the part of the other officers of the way in which Wm. H. Brown kept the accounts in New York, I find that Philo Brown had full knowledge in detail; that some of the former officers had general knowledge; that Van Dusen had such general knowledge, and knew in particular that this " Agent " account was kept, and that checks from this account were used to keep the " Brown & Bros." account in funds by Wm. H. Brown, but supposed it was so kept for his convenience; that Frisbie had no actual knowledge of the " Agent " account, and that Clowes knew of the existence of that account, but did not know its nature.

Collections, loans, and discounts of both accommodation and business paper made by Wm. H. Brown for the corporation, went directly into the " Agent " account; and Wm. H. Brown transferred funds by appropriate checks from one account to the other in the bank, as the exigencies of the affairs of the corporation demanded. When he placed funds to the credit of, or drew checks against, the " Brown & Bros." account, he notified the home office at Waterbury.

The bank understood that Wm. H. Brown was the business and financial manager at New York, and the only person who negotiated loans and discounts at New York. The bank also understood that Philo Brown as president, and Van Dusen as agent, had authority to sign the name of Brown & Brothers in relation to the accounts kept in the corporate name at the bank, and some evidence of such authority was filed with the bank.

All notes of Brown & Brothers made by Wm. H. Brown and discounted at the bank were signed by him officially as secretary or president, and indorsed " William H. Brown, Agent," except so far as the contrary appears in this finding in relation to the notes in question.

From the organization of the corporation there has existed a by-law, as follows:—" All papers relating to the business of the corporation shall be signed by the president or by

such officer or person as the directors shall designate and appoint at any regular meeting, and by no other person; and such appointment shall be duly entered of record." The records of the corporation show that Wm. H. Brown was present in 1854, at the first meeting of the corporation when this by-law was adopted. He was also secretary for a period of about six years, and kept the record book at the time the account was opened with the bank; but of this by-law he seems to have been ignorant; and there was no proof that the bank knew of its existence; and there is no record appointment of any person to conduct the branch of the business carried on in New York.

For many years, beginning as early as June 1st, 1878, a large amount of Brown & Brothers' notes were made and renewed from time to time by Wm. H. Brown as secretary or president, amounting at times to one hundred thousand dollars or more. These notes were made, renewed and carried, with the knowledge and approval of Philo Brown while living. Van Dusen knew that there was a large amount of such paper outstanding, but I am unable to say whether he had particular knowledge of specific notes. Neither Frisbie, Clowes nor Chatfield knew of the existence of such notes. No account of them was carried on the books of the company at Waterbury until after the resignation of Wm. H. Brown in 1884. They came into existence through the acts of Wm. H. Brown hereinbefore stated in purchasing quantities of copper, spelter and other supplies in excess of the then present needs of the corporation. Such loans and notes and purchases were made by Wm. H. Brown in transacting the company's business, and were intended for its benefit. The notes were renewed and carried by Wm. H. Brown by discounts at various banks until he resigned in May, 1884. Over $100,000 of these notes were paid by the company or assumed by it after May 1st, 1884, and after full knowledge on the part of the corporation of the course of conduct of Wm. H. Brown in obtaining the loans, and in making, signing, indorsing and renewing the notes. These notes did not appear in the annual inventories or in the

annual statements sworn to and returned by him. It did not appear that the Shoe & Leather Bank had any knowledge of the purpose for which any of these notes were made or renewed. The only difference between the loans and notes so recognized by the corporation, and the loans and notes in question in this suit, is in the form of the notes; that is, in the case of the notes so recognized, both originals and all renewals were signed by Wm. H. Brown as follows—" Brown & Brothers, by Wm. H. Brown, Sec'y" or "Pres." as the case might be, while in the case of the loans and notes in question, the first note having been originally made " Brown & Brothers, by Wm. H. Brown, Sec'y," on renewal thereof the form was changed; and in case of the other two loans and notes the original notes were made by Wm. H. Brown, as more fully appears from the detailed description of the origin and form of the notes earlier in this finding.

The appellees, for the purpose of showing a reason why the account in the name of " Wm. H. Brown, Agent," was opened in that form at the bank, offered evidence' that he became insolvent about the year 1873 and was thereafter unable to hold property in his own name until his father's death in 1880. To this evidence the appellant objected, and the court excluded it, to which the appellees excepted.

The officers and directors of Brown & Brothers on the 23d of August, 1884, made a contract with Franklin Farrel, under which he was to receive $100,000 of the stock of the corporation, and was to furnish funds for the payment of its indebtedness. At this time they had knowledge of the existence of the notes in question, but failed to inform him of them, but did not regard them as obligations of the corporation.

From 1875 to about the time Wm. H. Brown resigned in 1884 the only meetings of the directors were the annual meetings held in January in each year, at which officers were elected from year to year, except that during this period some ten or twelve meetings were held to appoint

agents to execute deeds, leases, and other instruments, two meetings to fix salaries, and one meeting to change officers.

The three notes in question were protested, and remained in the bank as suspended paper until December, 1885 ; and no notice of non-payment or of protest was given except to Wm. H. Brown and Wm. H. Brown, Agent, at 80 Chambers street, New York.

Notice was given the bank on May 6th, 1884, that Wm. H. Brown had ceased his official connection with the corporation and was no longer acting for it.

The home office at Waterbury never dealt with Wm. H. Brown as " Agent " except as stated.

No step has been taken by the bank to sell or appropriate in payment of the notes the collateral security held on account of the three notes in question, but the same is held by the bank, with the exception of the Brown & Brothers stock transferred to Farrel.

In the spring of 1884 the affairs of the corporation became involved and the corporation embarrassed.   At a meeting of the directors in New York, held May 5th, 1884, an examination of its affairs was made, Wm. H. Brown resigned his official connection with the company, and an attempt was made to ascertain the amount of its outstanding obligations. At this meeting Wm. H. Brown stated $40,000 as about the amount of outstanding notes and obligations that were not on the books of the corporation at Waterbury, and called the attention of some of the directors to the three notes in question ; but these notes and obligations were not believed by them to be legal claims against the corporation.

The next day, May 6th, 1884, Van Dusen and Chatfield, two of the directors, went to the Shoe & Leather Bank to examine into the indebtedness of Brown & Brothers, called upon Mr. Crane, the president, and asked to see all the notes and obligations held by the bank against Brown & Brothers. They were shown notes amounting to about $17,300, signed " Brown & Bros., by Wm H. Brown, Pres.," and the three notes in question ($15,000, $2,400 and $12,500), signed by Wm. H. Brown, and indorsed " Wm. H. Brown, Agent."

No express claim was made at this time that these three last sums were claims against the corporation; but Mr. Crane said that they were secured by collateral which he thought amply secured them. Subsequently several meetings of stockholders of the corporation were held, some of which Mr. Knapp, the cashier of the bank, attended (representing the Brown & Brothers stock formerly held as collateral, and theretofore transferred to the bank), to ascertain the condition of Brown & Brothers. At such meetings attempts were made to ascertain the whole amount of their indebtedness, and lists were prepared showing that the appellant had the notes amounting to $17,300, but no mention at any of these meetings was made of any of the three notes in question as claims against Brown & Brothers.

After those interested had obtained what they supposed to be a list of all the claims against the corporation, negotiations were opened with Farrel to induce him to come into the management of the corporation, and guarantee or provide for the payment of its indebtedness. Such progress was made that he was willing to enter into some arrangement looking to that end, and he then tried to ascertain himself the amount of the indebtedness of Brown & Brothers. To that end he called upon the bank, and, in connection with the proposed plan of indorsing the outstanding notes and providing for the obligations of Brown & Brothers, including the $17,300 held by the bank, asked the bank officials what the amount of the bank's claim against Brown & Brothers was, and was told by them that it was $17,300, and composed of the notes signed "Brown & Brothers." No knowledge or information in relation to the notes in question came to Farrel.

Negotiations were then in progress looking to Farrel's providing for the obligations of Brown & Brothers, and taking the management, and had not then resulted in a contract. And I find that with the understanding and belief on the part of Farrel that the bank's claim was limited to $17,300, and upon the faith that his information as to the indebtedness of and amount of claims against Brown & Brothers was

accurate, he was induced to and did enter into the contract that has been mentioned. The bank had full knowledge that Farrel was entering into the contract with that belief and understanding, and especially that its claim was limited to $17,300. In carrying out the contract the bank transferred to Farrel its proportion of the stock of Brown & Brothers held by it.

Farrel became president and assumed the control and management of the corporation August 25th, 1884, and indorsed the $17,300 notes held by the bank, and provided for the payment of the obligations of Brown & Brothers, and has been obliged to pay, or is held for, about $175,000, which has been proved against the estate of the corporation by the several holders of the paper; but he is liable for the whole, and is held for the balance after the payment of whatever dividend this estate will pay.

Certain other directors and officers were elected at the same time with Farrel, and the known outstanding notes were extended one year, and indorsed or provided for by Farrel, and the business of the corporation was continued for about a year and six months.

At the end of the year for which the $17,300 had been extended, $15,000 of the same was renewed by two notes of $10,000 and $5,000, with Farrel's indorsement, and the balance paid. When the $5,000 came due at the end of four months it was paid.

About the month of November, 1885, an attempt was made to secure a renewal of the remaining part of the $17,300 held by the bank, at which time the bank officials said they had no objections to a renewal of the paper, but that the three notes in question must then be taken care of. This was the first intimation that Farrel and those newly associated with him in the business had of the three notes in question; and the pending proceedings against the corporation were instituted.

The corporation is hopelessly insolvent, and Farrel must inevitably be a large loser by reason of the indorsements

made and obligations assumed by him, pursuant to his contract.

Under Farrel's management a large amount of capital was expended in new machinery, improvements, etc., but the affairs of the corporation did not become prosperous; and the occasion of the bank's making the claim against Brown & Brothers, in the fall of 1885 upon the three notes in question was, that their affairs were not as prosperous as the bank officials desired, and they feared that the stock of the corporation held by them as collateral was becoming so impaired in value as to endanger the security for the notes.

I am unable to state the reason why the business of the corporation was abandoned and these insolvent proceedings instituted; but I find that the immediate occasion of it was the discovery by Farrel of the notes in question, and the claim made by the bank thereon.

During the progress of the trial evidence to establish equities or priorities between the claim of Farrel, if he have any, and the rights or claims of the bank, if any it have, was objected to by the appellant, but my attention was not then turned to the decisions upon the practice in that respect in this state, and the objection was overruled. Afterwards, and while making a finding of facts preparatory to a decision of the case, I looked at the cases of *Beach* v. *Hotchkiss*, 10 Conn., 232; *Waterman's Appeal*, 26 id., 96; *Ashmead's Appeal*, 27 id., 241, and *Vail's Appeal*, 37 id., 185, and understand from these decisions that the practice in this state does not permit commissioners to declare and enforce such equities and priorities between creditors of an insolvent estate, and that the power so to do resides in the court of probate; but at the request of the appellees, and against the objection of the appellant, I have found and stated the facts relating to such equities and priorities. But I decline to make any order or judgment thereon, understanding that upon this appeal the Superior Court has no power so to do.

Upon the above facts judgment is rendered that the corporation of Brown & Brothers is indebted to the appellant,

the National Shoe & Leather Bank, in the additional sum of twenty-nine thousand nine hundred dollars, and said sum is allowed against said estate in favor of the appellant, the doings of the commissioners in rejecting said claim are reversed and set aside, and said commissioners' report is amended by including therein said sum of twenty-nine thousand nine hundred dollars as an allowed claim.

From this judgment the appellees appealed to this court. The grounds of appeal are sufficiently presented by the briefs of counsel.

*C. R. Ingersoll* and *S. W. Kellogg*, with whom was *J. P. Kellogg*, for the appellants (original appellees.)

1. The claim presented by the bank to the commissioners and disallowed by them consisted of three notes, amounting to $29,900. The claim was presented as embodied in these notes. The bank must stand or fall upon the claim as thus presented. It cannot now transform it into a claim for money borrowed by Brown & Brothers. There is nothing upon the notes to show that they were made by that corporation or that it is liable upon them. If it be claimed that it is represented by the indorsement of "Wm. H. Brown, Agent," yet the liability would be only a contingent one, upon which the corporation could not be held until it became an absolute one. The notes are not in the form of commercial paper, nor the indorsement in the usual form of an indorsement. And they were all secured by collaterals, which for aught that appears, in the cases of two of the notes, were sufficient to pay them. The notes are in the hands of the original payee and subject to all infirmities and defences.

2. The contract of the corporation, if any, was made in the city of New York and is to be governed by the law of the state of New York. *Webster & Co.* v. *Howe Machine Co.*, 54 Conn., 394. By the law of New York the corporation was entitled to notice of non-payment of these notes, whether the writing on the back is held to be an indorsement or a guaranty. The two parties to the notes as drawn were Wm.

H. Brown, the maker, and the bank as payee.    Where a third person, not a party to a negotiable note, indorses it in the manner these notes were indorsed, the third party must have due notice of non-payment, to entitle the holder to recover against him.    *Spies* v. *Gilmore*, 1 Comst., 321; *Moore* v. *Cross*, 19 N. York, 227.    A distinction is made in several of the New York cases in the Court of Appeals, between negotiable and non-negotiable notes; in the latter notice is not required, as the indorser is held to be a joint maker.    But in every case of a negotiable note, a third person not a party indorsing it is held to be entitled to notice; and without such notice he is not liable.    If the indorsement was a guaranty the bank should have proceeded against the maker of the notes, and if they could not be collected of him the collateral should have been sold and applied.    The authorities to this effect in the state of New York are given in the opinion in *Allen* v. *Rundle*, 50 Conn., 20.    If it was an ordinary indorsement by an authorized agent of the corporation it was entitled to notice of non-payment.    But no notice was given except to " Wm. H. Brown, Agent, 80 Chambers st., New York; " but at the time this notice was given Brown had ceased to be agent of the corporation and notice to him was not notice to the corporation.

3. We have assumed in the argument thus far that Wm. H. Brown had authority to bind the corporation by his indorsement of the notes as or in the name of " Agent." But Brown never had such authority, and the bank had sufficient notice to put it upon inquiry as to his authority. The finding is that there never was any vote of the corporation, or of its directors, appointing him agent, or authorizing him to sign or indorse the paper of the company as agent.    There was one person, Van Dusen, authorized to sign or indorse the paper of the company as agent, and his authority to do so was filed with the bank.    That was enough to put the bank upon inquiry as to the authority of Brown to sign or indorse as agent.    But Wm. H. Brown had an official capacity as secretary of the company to sign and indorse; and so had his father, Philo Brown, as presi-

dent, until his death in 1880. Evidence of their official authority to sign or indorse paper was filed with the bank. No bank in New York would take the paper of any corporation, especially a foreign corporation, without evidence of such authority. This bank was the one where the regular account of Brown & Brothers had been kept since 1875, and, so far as the finding shows, it was the only bank in New York where a regular account was kept with the company during this period. There had been a line of discounts running in the bank for five years when the first of the series resulting in these three notes was made in June, 1880. All other notes of the company before that time had been signed by Wm. H. Brown as secretary; after the death of his father he became president of the company, and signed its notes, " Brown & Brothers, W. H. Brown, Pres't." The finding is that these three notes were the only ones claimed to be the notes of the corporation ever discounted at the bank that were not signed by him in his official capacity, as secretary or president. Though Brown was the general agent of the corporation at the New York store, his general agency did not authorize him to sign or indorse papers as such agent. *Taber* v. *Cannon*, 8 Met., 456; *Paige* v. *Stone*, 10 id., 168; *Smith* v. *Cheshire*, 13 Gray, 320.

4. The corporation of Brown & Brothers is certainly not estopped in regard to these notes by anything that appears in the finding. It never knew of these notes or had any notice of them whatsoever. It is not estopped by the manner in which Wm. H. Brown kept his agent account in New York. No report of that account was ever made to the corporation in Waterbury; no account with him as agent was on their books; not a letter or paper was ever brought to the knowledge of the corporation with his name as agent. Not an officer of the corporation, except his father Philo Brown, knew that this account was kept as the account of Brown & Brothers. The only other officer who knew of it supposed it was kept for Wm. H. Brown's personal convenience. The fact that he and the estate of his father held a controlling interest in the stock can make no difference. It

did not bind or estop the other stockholders or the corporation. That was the fact with the Stockwells in the Howe Machine Company cases; but their action as president and treasurer did not bind the corporation. *Credit Co.* v. *Howe Machine Co.*, 54 Conn., 357.

5. These notes were illegitimate notes in fact and Brown could not bind the company by them. The finding is that these, and a large amount of other notes, which were not reported to the company, nor included in his sworn annual returns, were made for the purpose of purchasing large quantities of copper, in excess of the needs of the corporation, and for obtaining the benefit of any rise in price. It says, too, that they were intended for the benefit of the corporation. But that was simply a copper speculation, and the company was organized for no such purpose. It was organized for the "business of manufacturing copper and brass goods," as the finding shows. Brown had no right to use the credit or money of the corporation for that purpose, though intended for its benefit. His acts in this speculation were *ultra vires.* The result of it is evident in the bankruptcy of the corporation. And the bank must have known of this speculation. It was the only bank in New York where an account was kept by Brown or the corporation after 1875. Some sixty or seventy notes were discounted at the bank, secured by warehouse storage receipts of copper, amounting to from $300,000 to $400,000. The original note of $15,000 in 1880 was secured by a warehouse receipt of copper. The copper could not be used in manufacturing at their factory while pledged in New York by its warehouse receipt. The bank must have known it was a copper speculation; and it was bound to take notice whether the agent had a right to pledge the credit of the company for a speculation of this kind.

6. The original note of $15,000, given in June, 1880, was the only one of the three notes that was ever signed by Wm. H. Brown in his official capacity. When that note was taken up in October, 1880, it was stamped "paid" by the bank. A personal note of Wm. H. Brown, secured by

his personal collateral, was substituted in its place. The court below should have held, under the facts, that this transaction was the substitution of the note of another party, instead of a renewal of the original note; and that the original note was paid. The fact, too, that the bank took for a part of its security on these notes the stock of Brown & Brothers, shows conclusively that it did not consider the notes the debt of the corporation. The stock was no security at all for the debts if they were the debts of the corporation. It could only be security for the debt of another, in the nature of the corporation. Every dollar of its assets is held for its debts until they are exhausted and the stock becomes worthless. The pledge of its own stock for its own debts gave the bank no security at all. It would be security for Wm. H. Brown's personal debt. He and the bank agreed that this note of $15,000 should be taken with his personal security, in lieu of the original note signed by Brown & Brothers, and the bank is estopped from claiming that the original note has not been paid. The fact that the proceeds of these notes went into the account of Wm. H. Brown, Agent, and were applied to pay the obligations of the company, does not bind or estop the corporation as against the bank. Those obligations may have been the notes growing out of the copper speculation, and the proceeds went to pay some of the $100,000 of notes, more or less, that had been given by Brown for this illegitimate speculation. It is presumed under the finding that they were so applied, as the proceeds of these notes were never reported to the company. The company is not estopped by the receipt of the avails of the notes, applied for this unlawful purpose, without its authority, knowledge or ratification.

7. The court below erred in receiving the testimony of Wm. H. Brown, as to opening the accounts with the Loan & Indemnity Co. in 1872, against the objection of the trustees of Brown & Brothers. There is no claim that those accounts were ever brought to the notice of this bank; and it could not be admissible evidence in its favor. The

court also erred in refusing to receive the evidence offered by the trustees to show that Wm. H. Brown became insolvent in the year 1873, and was thereafter unable to hold property in his own name until after his father's death in 1880; as under that evidence it would have been shown that the account of Wm. H. Brown, Agent, was not opened or kept at the bank as the account of Brown & Brothers, but for an entirely different purpose and reason, as is usual with insolvent persons. No one of the officers of the corporation except Philo Brown had any notice that this account as agent was the account of Brown & Brothers; but those who knew of it supposed it was kept in that form for Brown's personal convenience.

8. The bank by its conduct is estopped on every principle of equity from enforcing these notes as a claim against the insolvent estate. By its action it misled both the corporation and Farrel to the injury of each; it induced each of them to act upon the belief that these notes were not the notes of the corporation, and thereby subjected them to loss if these notes are now allowed. When the two directors of the corporation went to the bank the morning after Brown's resignation, and called for all the notes and obligations held by the bank against Brown & Brothers, it made no claim except for the $17,300 regular notes. They had these three personal notes of Wm. H. Brown before them, but made no claim upon them as against the corporation. Afterwards, at several meetings of the stockholders at which lists were prepared and attempts made to find out the whole indebtedness of the corporation, Mr. Knapp, the cashier and the payee of these three notes, was present, and the claim of the bank was put down at $17,300, and no mention was made of the notes now in question as a claim against the corporation. It induced the company to believe that $17,300 was all the claim; and it made its arrangements with Farrel to continue the business acting upon that belief. It did so to the injury of the corporation, for it could have secured the collateral to apply in payment of the debt at the time, if it had been made known by the bank that these notes were a debt of

the corporation. The notes were protested before the Far-rel arrangement was completed. The bank gave no notice to the corporation, and made no claim. The bank as one of the stockholders entered into the arrangement with Farrel, and became a party to it. It transferred to him some two hundred of the five hundred shares held as collateral for the $12,500 note, knowing that the remaining stock could not possibly be sufficient security for that note ; and still it made no claim. It knew that the arrangement with Farrel was for him to indorse or assume all the indebtedness; the bank brought forward its other claims for his indorsement, but was silent as to these notes. It suffered them to lie as dead paper in its safe for a year and a half, and was still silent. Farrel became a party to all the indebtedness of the corporation upon the faith that the bank's representa-tions of the amount of its claim were true, and that the only indebtedness was the other notes of $17,300. The bank knew he acted upon that belief. There can be no question that the bank is estopped as against him. He stands in the place of the corporation in the assumption of its debts. The long settled law of this state in regard to estoppels is also the law of New York. And a corporation is estopped by the conduct of its agents. *Erie Co. Savings Bank* v. *Roop*, 48 N. York, 292; *Isham* v. *Buckingham*, 49 id., 216. The court below proceeded upon the theory that these notes were a valid claim against the corporation, in the remarks upon the decisions in the 26th, 27th and 37th Conn. Reports, and the law as to enforcing equities and priorities between creditors of an insolvent estate. But it is not necessarily a question of priorities. The commissioners had a right to decide whether the bank was not estopped by its conduct and the acts of its authorized agents from enforcing its claim upon these notes against the insolvent estate. They had power to decide upon the validity of the claim, and to disallow it upon this very ground of estoppel. Commis-sioners of insolvent estates have both law and equity powers in allowing or rejecting claims. *Donovan's Appeal from Probate*, 41 Conn., 551, 559.

*J. S. Beach* and *G. C. Lay* of New York, for the appellees (original appellants).

LOOMIS, J.   The appellant bank presented to the commissioners on the assigned estate of Brown & Brothers, an insolvent corporation, a claim aggregating the sum of twenty-nine thousand nine hundred dollars, represented originally by three notes, one dated January 15th, 1884, for $2,400, one dated March 15th, 1884, for $12,500, and one dated March 27th, 1884, for $15,000, all signed by Wm. H. Brown, and payable to H. N. Knapp, cashier of the appellant bank, four months from date, and all indorsed " Wm. H. Brown, Agent," and discounted at the appellant bank and the avails appropriated to pay the legitimate debts and obligations of Brown & Brothers.   The commissioners rejected the claim and the bank appealed to the Superior Court, where the claim was allowed in full, and now the trustees of Brown & Brothers bring the case to this court to revise the rulings of the Superior Court.

At the outset of the discussion before this court the counsel for the appellees made a vigorous effort to restrict the inquiry simply to the question whether Brown & Brothers could be held liable as makers, indorsers or guarantors of the notes in question, irrespective of the fact that they received the proceeds; and many of the errors assigned hinge upon this idea.   Had the claim been so restricted in its presentation and prosecution there would be obvious difficulties in the way of sustaining the judgment of the Superior Court, for one must be a party to a note to be made liable as maker or indorser, and the face of the notes in question does not indicate that they had any relation to Brown & Brothers, and if the indorsement " Wm. H. Brown, Agent," could be regarded as the indorsement of Brown & Brothers, it would still be a mere contingent liability, without any foundation being laid to make that liability absolute.

We think, however, that the record does not sustain the claim that only the notes themselves were presented and considered before the commissioners.   The form of the pre-

sentation of the claim is not explicitly stated. The report of the commissioners only shows the gross amount presented, without a reference to any notes. The reasons of appeal from the doings of the commissioners, after referring to the three notes presented to the commissioners as representing the claim of the appellant amounting in the aggregate to the sum of $29,900, give this additional reason, " that the consideration of all said notes was money loaned to Brown & Brothers and that the money so loaned was used by the corporation in conducting its business and for its benefit." Now it is obvious from the record that this last mentioned reason was one of the issues of fact before the trial court and much evidence was received on both sides bearing on this point without any objection on the part of the appellees based on the restricted nature of the claim presented, and this issue as to the consideration and the application of the proceeds of the notes was distinctly found against the appellees. We think therefore there is no foundation for this objection ; and what we have said in this connection is a sufficient answer to all the arguments and all the assigned errors which assume or imply that the claim of the appellant was based solely on the technical liability of Brown & Brothers as makers, indorsers or guarantors of the notes referred to.

In regard to most of the remaining objections, we think the appellees have been concluded by the finding of facts.

The contention in the court below (as indeed in this court) centered around three propositions of fact, namely, that Wm. H. Brown was the financial agent of Brown & Brothers in New York at the times these loans were made by the bank ; that under his general agency he had authority to bind the Brown & Brothers corporation by procuring accommodation loans on its credit; and that the entire proceeds of the loans in question went to pay the debts and obligations of the corporation.

Now a reference to the finding will show that every one of these propositions is affirmed in the most direct and explicit language. This result carries the case upon its

merits entirely beyond our province for review, for it will not suffice to assign for error that the court ought not to have so found the propositions of fact, and this it will be seen characterizes several of the assignments. Some intervening error of law must be shown which led to an erroneous result. Does any such error appear?

It was claimed in the argument, (but is not assigned for error and therefore it does not require notice,) that the avails of these notes were used in copper speculations by Wm. H. Brown, and therefore his acts, though for the benefit of the corporation, were *ultra vires.*

It is not found that the avails of the notes in question were so used, but it is found that "for many years before the failure of the corporation Wm. H. Brown had been in the habit, in connection with the business of buying supplies for immediate use at Waterbury, of obtaining loans in the name and for the benefit of the corporation, for quantitities of copper, spelter and other supplies, in excess of the immediate necessities of the corporation, and for the purpose of obtaining the benefit of any rise in the price thereof that might occur." Now if the inference was legitimate that the avails of the notes in question were included, there is nothing *ultra vires* in the act. The corporation was organized for the manufacture of copper and brass goods. It would be a strange restriction if it could not invest in the raw material it must use, in excess of its immediate necessities, or that it could not buy largely when the material was low in price with a view of having the benefit of it when it should rise. There is nothing in the finding that intimates that the purchases of the copper were not made for ultimate use or that they were made merely to sell again in the market.

There are two assignments of error which relate to the ruling of the court as to the admission of evidence. The first is stated in the finding as follows : "Against the objection and exception of the appellees, Wm. H. Brown testified that about the year 1872, with the knowledge of the officers of the corporation, and with the acquiescence and in

the presence of said Philo Brown, Wm. H. Brown opened accounts with the Loan & Indemnity Company, a banking corporation in New York city, as follows: One account with 'Wm. H. Brown, Agent,' and the other with 'Brown & Bros., Wm. H. Brown, Secretary,' and the signatures of Philo and Wm. H. Brown, were then left at the bank. The records of the corporation do not show Wm. H. Brown's appointment as secretary until January, 1874. I find the facts as above testified to by said Brown, except as to the date of beginning the account."

The facts above testified to were the only ones to which objection was made. The court proceeded without objection to hear evidence, upon which it was further found that "it was confusing to have the same bank account for the business transactions at Waterbury and New York city, and the two accounts were opened as matter of convenience in transacting the business of the corporation. The account under the name of Wm. H. Brown, Agent, was the one used in the conduct of the New York business, and the account under the name of Brown & Bros. was used in connection with the business at Waterbury. Wm. H. Brown had entire and exclusive control over the account of Wm. H. Brown, Agent. The Loan & Indemnity Company went out of business in 1875, when the accounts were transferred to the National Shoe & Leather Bank, the appellant in this case. The accounts were opened in the National Shoe & Leather Bank in the same forms as in the Loan & Indemnity Company. Philo Brown and Wm. H. Brown left their signatures at the bank, and the signature of Van Dusen was sent or left there. Philo Brown had full knowledge of this transfer of the accounts to the Shoe & Leather Bank, and the accounts were so kept with his consent thereafter."

By way of criticism it may not be amiss to say that the error as assigned, contrary to the record, applies the objection to evidence of other connecting facts as well as to the one first mentioned. It also makes the alleged inadmissibility of the evidence depend wholly on the fact that it did not appear that the appellant had knowledge of the facts so

proved, a point not raised at the trial; if it had been the evidence might have been supplied.

But we will consider the objection as it stands. In the first place, we do not see how the evidence could have prejudiced the appellees, for if it were stricken out we would have precisely the same mode and course of dealing by the same person and for the same objects continued for nine years with the appellant bank. But the evidence was admissible to complete the continuous history of Wm. H. Brown's financial transactions for the corporation in New York, to explain the origin and mode of keeping the accounts and of procuring loans for the benefit of the corporation, and to show knowledge of his doings on the part of the directors.

It is a mistake to assume, as is done in the assignment of error we are considering, that knowledge on the part of the appellant was a prerequisite to the admissibility of the evidence in question. Had the appellant's claim been based solely upon an appearance of authority upon which it relied, where the circumstances would estop the corporation, knowledge might be essential. But the parties were at issue upon a question of agency. It was immaterial whether or not the bank had any proof that Brown was agent of this corporation when they furnished the money. It will suffice if they first discover and produce it on the trial of their claim. A general agency is established and defined not merely by the authority which the agent actually receives from his principal, but by that which the latter allows the former habitually to assume and exercise. Now this evidence that Wm. H. Brown was allowed to act during the many years covered by his transactions with the appellant bank and its immediate predecessor with the knowledge and acquiescence of the directors of Brown & Brothers, tended strongly to establish the fact found by the court, that he was the general and exclusive financial agent of the corporation in New York.

The remaining claim as to the admission of evidence is stated as follows in the finding: " The appellees, for the purpose of showing a reason why the account in the name

of Wm. H. Brown, Agent, was opened in that form at the bank, offered evidence that Wm. H. Brown became insolvent about the year 1873 or 1874, and was thereafter unable to hold property in his own name until his father's death in 1880;" which the court excluded.

We think this would have raised an issue entirely outside the merits of the controversy. It was incumbent upon the bank to show that it loaned the money to Brown & Brothers and not to Wm. H. Brown individually or as agent of anybody else, and whether he was a bankrupt or not was of course immaterial to this question. The only possible pertinency of the fact was in its furnishing a reason why he kept the account in this way. But not only is the fact found that the two accounts were kept in this way from the outset as a matter of convenience, and to save the embarrassment that would grow out of their keeping only one account for the two branches of the business, and that discounts for Brown & Brothers were constantly carried to this account, but no evidence whatever was presented, or proposed to be offered, to show that his insolvency operated as a motive to the keeping of the account in this way, or was operative in determining his conduct in other like cases. Wm. H. Brown was a witness on the trial and could easily have been inquired of upon the point. As the matter stood when that evidence was passed upon by the court, nothing was offered but the mere fact of his insolvency. The court could not presume that other evidence would be offered to make it relevant. That fact standing alone could have no pertinency.

We do not think the remaining objection, that the bank by its conduct has estopped itself from making and enforcing its claim against the corporation, has any foundation to rest upon. The finding shows that there was no concealment by the bank of these notes from the Brown & Brothers corporation or its officers. At a meeting of the directors on the 5th of May, 1884, Wm. H. Brown called attention to the three notes in question, and on the next day Van Dusen and Chatfield called at the appellant bank and were then

shown the three notes in question and the manner in which they were signed. The court expressly finds that "the officers and directors of Brown & Brothers had, when the contract was made with Farrel, knowledge of the existence of the notes in question, but failed to inform him of their existence; but they did not regard them as obligations of the corporation." It was not then the conduct of the bank that misled the directors, but their own erroneous views of the law.

Whether or not Farrel has any grievance as against the appellant it is not our province to determine in the present case.

There was no error in the judgment complained of.

In this opinion the other judges concurred.