## FARREL *v.* NATIONAL SHOE & LEATHER BANK.

*(Circuit Court, D. Connecticut. July 18, 1890.)*

1. DECEIT—MISTAKE OF LAW.
    Plaintiff, being about to enter into a contract with a corporation for loans and advances to it to a large amount, provided its debts had been accurately stated, for the purpose of verifying said statement, asked the defendant bank how much the corporation owed it. Defendant told him a certain amount, which did not include notes given to it by a third person for money actually loaned for the benefit of and received by said corporation, liability for which was denied by said corporation, and not understood, at the time, by the officer who gave the reply. The bank acted in good faith. Plaintiff, relying upon the correctness of the answer, entered into the contract. The bank afterwards claimed that the corporation was liable upon said notes, sued it thereon, the corporation went into insolvency, and great loss was suffered by plaintiff. In an action of deceit, *held,* that defendant was not liable, its representation having been made in good faith, the mistake which caused the misrepresentation being a mistake of law upon a state of facts which were imperfectly understood.

2. JUDGMENT—PRIVIES—ASSIGNMENT FOR BENEFIT OF CREDITORS.
    Though, under the insolvent laws of Connecticut, the trustees of an insolvent estate are the representatives of the creditors for the appropriation of the property of the insolvent towards the payment of their debts, they are not their privies in law so that a creditor is bound by all the findings of the court in a suit between the trustees and another creditor as to the validity of the latter's claim against the estate.

At Law.

*J. P. Kellogg, S. W. Kellogg,* and *Chas. R. Ingersoll,* for plaintiff.

*Geo. C. Lay, H. C. Robinson, J. Halsey,* and *John W. Webster,* for defendant.

SHIPMAN, J. This is an action at law, which was tried by the court, the parties having filed a written stipulation waiving a trial by jury, as will more fully appear by the stipulation which is a part of the record. Upon the trial by the court the following facts were proved, and are found to be true: In the year 1853, or 1854, a joint-stock corporation, under the name of Brown & Bros., was formed under the laws of this state for the manufacture of brass and copper goods in the town of Waterbury, which business was continuously prosecuted until the insolvency of said corporation in 1885. The corporation had for many years a store and branch office in New York city, of which William H. Brown had charge from about 1868 till 1884, and for a period of more than nine years before 1884 he acted as the New York agent and representative of the corporation, and during that time had exclusive charge of the loans and discounts obtained for it, or for its use, in New York. From 1875 till 1880, he was secretary of the corporation, and from 1880 to 1884 he was its president. In 1875 he opened two accounts with the defendant, one in the name of "William H. Brown, Agent," and

the other in the name of "Brown & Bros., William H. Brown, Secretary." Each of these accounts related solely to the business of the corporation. The "agent" account was the one used in the conduct of the New York business, and the other was used in connection with the business at Waterbury. Said Brown was in the habit of obtaining loans from said bank for the use of said corporation, upon accommodation paper made in the name of Brown & Bros., and secured by deposits of warehouse storage receipts of copper. On June 26, 1880, he gave such a note for $15,000, the proceeds of which were credited to the "agent" account. When it was renewed, he wanted to change the collateral, and offered, instead of the warehouse receipts, to give 600 shares of the Norwalk Lock Company stock, which he owned individually. The proposition was accepted, but the bank desired the form of the note to be changed so that said Brown should be the maker, because he was the owner of the collateral. This was done, and the new note was signed by William H. Brown, and was made payable to the order of the cashier of the bank. The note was also indorsed as follows: "WM. H. BROWN, Agt." Subsequently other notes for $2,400 and $12,500 were made in similar form, were payable to the order of the cashier, were signed by Brown individually, and were secured by stocks which he owned individually, and continuously thereafter, down to and at the time of the failure hereinafter mentioned, the renewals of said three notes, drawn and indorsed in the same form, and secured in the same way, amounting to $29,900, were due to and were owned by said bank. The second and third notes, and the renewals thereof, were each indorsed as follows: "Pay Nat. Shoe & Leather Bank. WM. H. BROWN, Agt." Said three loans were obtained from said bank for the benefit of said corporation, and, when made, were understood by said bank to be made to said corporation, and by the change in the form of the notes said bank did not intend to affect the liability of said corporation thereon. The proceeds of said three notes were used by said Brown for the benefit of said corporation. At the time of the transactions hereafter mentioned, said bank also owned the notes of said corporation, signed "BROWN & BROS.," to the amount of $17,300, which had been theretofore discounted by said bank for the benefit of said corporation. In the spring of 1884 said corporation became financially embarrassed, and on May 5, 1884, said Brown resigned all official connection with it, and the company substantially suspended business. Meetings of the stockholders were held, and efforts were made to secure some one to take the management of the company, and raise or provide money to carry on its business. A committee of the stockholders applied to the plaintiff, Franklin Farrel, who was a man of recognized financial credit and large means, to take the management of said company under his exclusive control, giving it the aid of his resources, credit, and business ability. The negotiations resulted in a contract between the stockholders of said company and said Farrell, whereby stock of said corporation of the par value of $100,000 was transferred to him in consideration of his written agreement, the important part of which is as follows:

"I further agree, for the consideration aforesaid, to loan and advance to said company, at 6 per cent. interest, such sum or sums of money as may be necessary to provide for the payment of the present existing indebtedness of said company, except such indebtedness as may be assumed by me or otherwise provided for in such manner as may be convenient for me, but in such way as shall relieve said company from claims thereon; and also to loan and advance such other sums of money as may be necessary to place said company upon a safe and reliable basis for the continuance of its business, and to provide stock, supplies, and means for carrying on the same, and to make necessary repairs and improvements in the mills and machinery of said company, and to provide for the continuance of its business, which sums of money so loaned and advanced to said company shall not be withdrawn or repaid to him until the existing indebtedness now being against said company shall be paid or provided for, or assumed by said Farrel, and said company relieved from liability thereon; but the interest on all sums so loaned or advanced by said Farrel shall be payable to him annually."

During the progress of the negotiations with Mr. Farrel, statements of the assets and a list of the liabilities of the company were made out at the meetings of the stockholders. The debt to the Shoe & Leather Bank was put in these lists at $17,300. The real estate and machinery were put in at $550,000 in these statements. With this valuation the statements showed an excess of about $223,000 of assets over liabilities, inclusive of the capital stock. The statements were shown Mr. Farrel. Before completing the arrangement, Mr. Farrel undertook to ascertain for himself the actual amount of the assets and liabilities, and through his agent verified the accuracy of such inventory, by actual count and weighing the manufactured stock on hand, except the stock of German silver goods, of which there was a considerable quantity, with which his agent was not familiar, and he took the statement of the officers or clerks of the company as to the value of that part of the assets. For the purpose of ascertaining the amount of the liabilities, and whether an extension could be obtained thereon with his indorsement, Mr. Farrel visited the different banks which held the bulk of the obligations of Brown & Bros. He went to the Shoe & Leather Bank, and asked Mr. Crane, the president of the bank, what the amount of the indebtedness of Brown & Bros. was to the bank, and whether the bank would extend them for one year upon his indorsement. Mr. Crane asked the discount clerk for the exact amount of Brown & Bros.' notes, and gave the amount of the notes to Mr. Farrel as $17,300, and agreed to give the extension requested. Mr. Farrel then visited all the other banks holding Brown & Bros.' paper, and found that the indebtedness of the company to those banks corresponded in amount with the list of the indebtedness given him by the company, and that he could procure a like extension from all the other banks. After he had ascertained these facts he decided to take the management of the company, and secure or indorse its liabilities, and to enter into the agreement hereinbefore mentioned. At the time of said Farrel's interview with the president of the Shoe & Leather Bank, said bank, in addition to the notes of Brown & Bros. for $17,300, which were unsecured, held the three notes hereinbefore mentioned, secured by 696 shares of Norwalk Lock Company stock, and 613 shares of Brown &

Bros. stock. Mr. Crane made no mention of these notes to Mr. Farrel. At the time of said interview Mr. Crane believed said notes to be fully secured by the personal collaterals of William H. Brown, and did not consider them to be obligations of Brown & Bros., and the liability of said corporation on said notes did not become apparent to him until afterwards. It was upon the understanding and belief by Mr. Farrel that the indebtedness of the company did not exceed the amount that had been so represented to him, and that the defendant's claim against the company did not exceed the amount that had been so represented to him, and that the defendant's claim against the company did not exceed the amount of $17,300, that Farrel was induced to and did enter into the arrangement with said company, and make said contract. The amount of the indebtedness was a material question with said Farrel in deciding upon and afterwards making the contract with the stockholders, and he would not have made said contract if he had known or been informed that the bank held another claim of $29,900 against the company by reason of the notes given by William H. Brown for that amount. The bank had full knowledge that said Farrel was inquiring into the amount of the indebtedness for the purpose of deciding whether he would take the management of the company, and that he decided to do so with the belief and understanding that the claims of the bank against the company did not exceed $17,300. Mr. Crane acted in good faith in his statement to Mr. Farrel. In carrying out the contract the bank transferred to Farrel its proportion of the stock of Brown & Bros. held by it. Farrel became president, and assumed control and management of the corporation, August 25, 1884, and indorsed the $17,300 notes held by the bank. The first extension was for one year; $15,000 of the same was then renewed for four months, the balance being paid. At the end of that time, when said Farrel sought a further extension, he was for the first time informed that a claim was made by the bank that the company was liable for said notes of $29,900. All the notes of $17,300 against the company, and also the notes for $29,900, had been protested, and were overdue, and lying in the bank as protested paper, at the time of Mr. Farrel's first interview with the bank officers in August, 1884. It was for the interest of the bank that said Farrel should take the management of the company, and indorse or secure the $17,300 held by the bank as protested paper of the company, as the debts of the company were in excess of their assets aside from their mortgaged real estate and machinery, and nothing could have been realized from the equity in said mortgaged property. After assuming control of the corporation, Farrel, in addition to indorsing the notes of the defendant bank, as above stated, indorsed the notes of the company held by all the other banks. He also borrowed $35,000 upon a note of the company, secured by his indorsement and collateral stocks of his own, which was presented to the commissioners, and allowed by them, but Farrel has paid the same in full. This money was used in paying current bills and starting work in the factory. He has also paid a large amount of other indebtedness of the company, and is held as indorser upon the remaining bank notes of the

company, so that what he has paid and what he is liable to pay will amount to $223,803.93, upon which dividends of 45 per cent. only have been or will be paid. The business continued under the management of Mr. Farrel for about a year and four months, when it was found that the company was insolvent, and that the capital stock could not be made of any value. Mr. Farrel undertook to settle up the business by paying or assuming all the claims against the company in full, whether secured or not, and disposing of the property to the best advantage. At this time the bank made the first claim to him that the company was liable for the three notes of $29,900, and soon after brought suit thereon against the company. In consequence of that claim and suit the company made their assignment in insolvency, under the statutes of Connecticut, for the joint and equal benefit of its creditors.

There had been large losses in the business after Farrel assumed the management, and there had been little or no profits. A considerable portion of this loss is accounted for by the disposition of the silver goods and business at a sum more than $30,000 less than they were inventoried for, and a fall in the price of copper. The losses to the company were not caused by the fault, neglect, or mismanagement of Farrel or his agents. Commissioners were appointed by the proper probate court to receive and allow or disallow claims against the estate of said corporation. The defendant presented its claim upon said three notes for $29,900, and upon the money represented thereby, which had been loaned to Brown & Bros., which claim was disallowed. The defendant appealed from said disallowance to the superior court for New Haven county, which court made a full finding of facts in the case, reversed the doings of the commissioners, and allowed the claim. Upon appeal, the supreme court of errors decided that there was no error in the judgment of the superior court, upon the ground that William H. Brown had authority to bind the corporation by procuring loans on its credit; that the entire proceeds of the loans went to pay the debts of the corporation, and that ignorance by the bank of such agency, if ignorance existed, was immaterial. It thereupon became the duty of the probate court to divide the fund resulting from the sale of the assets of said insolvent corporation among its creditors. The plaintiff and the trustees of the insolvent estate brought their petition to that court, setting up at length the facts which have been heretofore stated, and claiming "an equitable estoppel, which would prevent the bank from receiving any dividend upon its claim of $29,900 until Farrel had received upon his claim for moneys advanced to and liabilities assumed for Brown & Bros. the full dividend that he would have received if the bank's claim for $29,900 had not been presented." The court of probate dismissed the petition. Upon appeal of the petitioners to the superior court the facts were found in full by the court, and the questions of law arising thereon were reserved for the advice of the supreme court of errors, which court advised that the decree of the probate court should be reversed, and that court should be directed to pass a decree dividing the fund in its control in accordance with the prayer of said petition. This was ac-

cordingly done. Said Farrel's claims were $223,803.13. Said bank's claim was $29,900. The dividends then declared were 35 per cent., and the bank's share thereof was $10,465. Of this sum said Farrel received $7,385.53, and the bank received $3,079.47. Thereafter the present action at law, to recover the amount which the plaintiff lost in consequence of the defendant's untrue answer to his question, was brought. The plaintiff, to sustain the averments of his complaint, introduced the finding of facts by the superior court in the case of the appeal of the trustees of the estate of Brown & Bros. and Franklin Farrel against the defendant, which was admitted, and the facts hereinbefore found in regard to the transactions subsequent to the resignation of William H. Brown are stated in the language of said finding. The plaintiff also offered the finding of facts by the superior court in the case of the appeal of the present defendant against the trustees of said insolvent estate from the doings of the commissioners in the disallowance of said claim for $29,900. The admission of this evidence was objected to by the defendant. This record was offered upon the ground that the trustees represented in all their acts the creditors of the estate of the insolvent corporation, and that Mr. Farrel, as one of said creditors, was therefore a privy in law with the trustees. Although it is true that, under the principles of the insolvent laws of Connecticut, the trustees of an insolvent estate become the representatives of the creditors for the appropriation of the property of the insolvent towards the payment of their debts, and can avoid conveyances which are fraudulent and void as against attaching creditors, I do not think that there is such a mutual or successive relationship to the same rights of property between each creditor and the trustees as to make them privies in law, and to compel any creditor, as to rights or liabilities between himself and another creditor growing out of or incidental to their respective claims against the insolvent, to be bound by all the findings of a court in a suit between the trustees and such other creditor, wherein the validity of the latter's claim against the estate was the only matter properly in issue. I do not, therefore, admit the finding of facts in the defendant's appeal upon the ground that Farrel is a privy in law with the trustees, but the finding so far forth as it relates to the origin and history of said three notes, of the liability of said corporation thereon, the knowledge of the bank that the avails were for the benefit of the corporation, and to the intent of the bank in regard to said liability, is admissible, and was admitted, because the action was by the bank to enforce said liability, and the statements in regard to the origin of the claims, the use of the avails of the notes by the corporation, and the knowledge and intent of the bank in regard to the liability of the corporation were the bank's case, and are deliberate declarations or admissions on its part of the truth of these facts, which are also important in this case. 1 Greenl. Ev. § 527a; Steph. Dig. Ev. 100. The facts hereinbefore stated, which took place up to and including the resignation of said W. H. Brown, were admitted. Said two records were the only testimony which was offered by either party in regard to the alleged fraud by the bank. The plaintiff's direct loss in

consequence of entering into said contract, which he would not have entered into if the bank had answered his question correctly, was and is $115,706.63, without interest.

Upon the foregoing facts, the principal question is as to the liability of the defendant for the direct and injurious consequences which resulted to the plaintiff from the untrue, and in that sense, false, representation which was made by its president to the plaintiff concerning a material fact, the knowledge of which especially belonged to the bank. The oral argument was directed more particularly to the question whether the finding that Mr. Crane acted in good faith in making the representation was a finding which determined the result in favor of the defendant. The plaintiff contended that the facts brought the case within the principle announced in some of the modern cases, especially by the courts of Massachusetts, which is in favor of holding the person who makes positive material misrepresentations, not as to matters of opinion, and not by way of commendation of the seller's wares, but as of his own knowledge, professing to have knowledge that the representations are true, liable for the damages which are directly caused to a person to whom the representations are made, and who relies, to his harm, upon his confidence in their truth. Mere belief in the existence of a thing "will not warrant or excuse a statement of actual knowledge," in the view of the courts of Massachusetts. *Furnace Co.* v. *Moffatt,* 147 Mass. 404, 18 N. E. Rep. 168. The defendant insisted that the case was an ordinary action of deceit in which proof of fraud is requisite, and that to constitute fraud the false representation must be made either knowingly, or without belief in its truth, or recklessly, *i. e.,* careless whether it is true or false; and that a false statement, honestly believed, though on insufficient grounds, falls short of, and is a different thing from, fraud. In support of this position much reliance was placed upon the recent case of *Derry* v. *Peek,* L. R. 14 App. Cas. 337, overruling the judgment of the court of appeals, reported in 59 Law T. (N. S.) 78. The real difference between the courts is in regard to the latitude which shall be given to the word "recklessly," the house of lords, in *Derry* v. *Peek,* holding that the person who makes the misrepresentation must be actually reckless or careless whether he tells the truth or not, while the tendency of other judges is to hold that when a person has no reasonable cause to believe a thing to be true, and makes positive statements upon very insufficient cause, he is reckless. There is, however, a class of cases which comes under the general head of cases of deceit, in which, as it is generally held, the intent to deceive may not be a controlling circumstance. This class is described by Lord HERSCHELL, who gave the leading opinion in *Derry* v. *Peek, supra,* as follows:

"There is another class of actions which I must refer to also for the purpose of putting it aside. I mean those cases where a person within whose special province it lay to know a particular fact has given an erroneous answer to an inquiry made with regard to it by a person desirous of ascertaining the fact for the purpose of determining his course accordingly, and has been held bound to make good the assurance he has given. *Burrowes* v. *Lock,* 10

Ves. 470a, may be cited as an example where a trustee had been asked by an intended lender upon the security of a trust fund whether notice of any prior incumbrance upon the fund had been given to him. In cases like this it has been said that the circumstance that the answer was honestly made in the belief that it was true affords no defense to the action. Lord SELBORNE pointed out, in *Brownlie* v. *Campbell*, L. R. 5 App. Cas. 925, that these cases were in an altogether different category from actions to recover damages for false representation, such as we are now dealing with." *Slim* v. *Croucher*, 1 De Gex, F. & J. 518; *Bower* v. *Fenn*, 90 Pa. St. 359.

This case is, in many of its leading features, very similar to those which are stated in the paragraph which I have quoted, and, if the facts are within the principle of those cases, the defendant is liable, notwithstanding his good faith. In this case, for the purpose of determining his course, Farrel was desirous of ascertaining from the bank a fact which it might be expected to know. The bank knew that Farrel's inquiry was for the purpose of deciding whether he would enter into the obligations which were specified in the proposed contract with the stockholders of Brown & Bros. If the three notes for $29,900 had been of the same character as the notes for $17,300,—that is, if the liability of Brown & Bros. had been known and manifest thereon,—Mr. Crane's forgetfulness of their existence, or opinion that they were fully secured, and his consequent good faith in answering Farrel's inquiry, would have been immaterial. The liability of Brown & Bros. was not one which was manifest upon the notes, but was a legal question, dependent upon the existence of a state of facts outside the notes, and this liability was not then apparent to Crane. The notes were made by Brown individually to the order of the cashier of the bank. They were then indorsed: "WM. H. BROWN, Agent," and from the instruments themselves and alone, the name of the corporation nowhere appearing upon the paper, it could not be clearly ascertained who was, in law, the indorser. *Falk* v. *Moebs*, 127 U. S. 597, 8 Sup. Ct. Rep. 1319; *Hitchcock* v. *Buchanan*, 105 U. S. 416. The liability of the corporation was not placed by the supreme court of errors upon the notes, but upon the fact that the loan was actually for the benefit of the corporation which used the money. The court say:

"Had the claim been so restricted, * * * [to the question whether Brown & Bros. could be held liable as makers, indorsers, or guarantors,] there would be obvious difficulties in the way of sustaining the judgment of the superior court, for one must be a party to a note to be made liable as maker or indorser, and the face of the notes in question does not indicate that they had any relation to Brown & Bros.; and, if the indorsement, 'WM. H. BROWN, Agent,' could be regarded as the indorsement of Brown & Bros., it would still be a mere contingent liability, without any foundation being laid to make that liability absolute." *National Shoe & Leather Bank's Appeal*, 55 Conn. 490, 12 Atl. Rep. 646.

When the form of the notes was changed, the bank intended that the corporation should be still liable, but it was plain that this liability was denied by the directors, and apparently Crane believed or had become satisfied that their opinion was well founded. The finding is that, at the time of the interview with Farrel, "Crane did not consider them [the notes] to be obligations of Brown & Bros., and the liability of said cor-

poration on said notes did not become apparent to him until afterwards." The corporation also did not consider itself to be liable thereon, and contested its liability through three courts, and it was not until an exhaustive examination of the facts that its liability became apparent. The existence of the facts upon which the validity of the claim depended subsequently became clear, and the disastrous attempt was made to enforce this liability by suit, but when the conversation took place Crane thought that he must rely upon Brown and his collaterals. The mistake or error which caused the misrepresentation was a mistake of law upon a state of facts which, when known, are apt to be puzzling. He did not forget, and did not conceal; but he was mistaken in his legal conclusions. If the misrepresentation had been, in terms, that of a conclusion of law as to the legal consequences of facts truly stated, the bank would have been undoubtedly not liable, (*Eaglesfield* v. *Marquis of Londonderry*, 4 Ch. Div. 693;) and it is true that Crane did not tell Farrel the history of the $29,-900 note, but simply stated the result, viz., that the bank's claims against Brown & Bros. were $17,300. The misrepresentation was not, therefore, a mere misrepresentation of law, because he did not tell Farrel his opinion or conclusion upon facts which were also communicated. But the finding leads to the conclusion that these facts did not become clear and the consequent liability did not become apparent to him till afterwards, and in that respect the case is peculiar. A misrepresentation was made, resulting from imperfectly understood and blurred facts, and a consequent erroneous conclusion of law, and it is, in my view, unjust to hold that the person who honestly comes to such an erroneous conclusion must be visited with the unfortunate pecuniary consequences of his error. It was a mistake by reason of which Farrel has suffered terribly, and one which might have been avoided had Crane been more talkative, and told Farrel of all the bank's transactions with Brown, but yet a mistake which ought not to be visited upon the bank in this suit. The conclusion is that, upon the facts as found, the defendant is not liable in this suit.